**IN THE UNITED STATES DISTRICT COURT**
**DISTRICT OF UTAH, CENTRAL DIVISION**

| | |
|---|---|
| KIRK PETERSON, et al., | Case No. 1:08 cv 40 BCW |
| Plaintiffs, | **ORDER AND MEMORANDUM DECISION GRANTING MOTION FOR SUMMARY JUDGMENT** |
| vs. | |
| LYNN YEATES, et al., | |
| Defendants. | Magistrate Judge Brooke C. Wells |

Chad Phillip Peterson committed suicide on November 10, 2007 while he was incarcerated at the Box Elder County Jail. Plaintiffs, Kirt Peterson and Susie Williams, the parents of the decedent, bring this lawsuit on his behalf asserting a 42 U.S.C. § 1983 claim against Box Elder County and the employees of the Box Elder County Sherriff's Office—in their official capacities. Plaintiffs allege that these individuals were deliberately indifferent to the risk that Mr. Peterson would commit suicide. Plaintiffs further claim that the Defendants failed to train, supervise and discipline those who were involved with Mr. Peterson during his incarceration. Finally, Plaintiffs alleged the Defendants failed to meet the duty owed to the decedent and therefore were grossly negligent in protecting his life.

Defendants move for summary judgment on the basis that Plaintiffs cannot show the necessary prerequisites for liability against Box Elder County and its officials as required under 42 U.S.C. § 1983 and 1988. Defendants further assert that Plaintiffs' claims are not cognizable

under 42 U.S.C. §§ 1983 and 1988.  And finally, Defendants assert that they are immune from "suit under the Eleventh Amendment in that the Sheriff and his subordinates were acting as mandated by state law in their official capacities in housing a state prisoner who was under the authority and jurisdiction of the State of Utah Department of Corrections and Board of Pardons."[1]

The Court heard oral argument on Defendants' motion.  Plaintiffs were resented by Alyson E. Carter and Defendants were represented by Frank D. Mylar.  During oral argument, the Court questioned Plaintiffs' counsel regarding why certain individuals remained as Defendants, despite evidence demonstrating that there was no substantial link between them and Chad Peterson's death.  Counsel agreed that certain individuals were not significantly involved and the Court entered an order dismissing these Defendants.[2]  Now having heard oral argument and after considering the parties' memoranda, affidavits, and relevant case law the Court renders the following decision as to the remaining Defendants.[3]  As outlined below, the Court GRANTS Defendants' Motion for Summary Judgment.[4]

---

[1] Mtn. p. 2.
[2] Docket no. 120.  The Defendants dismissed with prejudice included Clark Richards, Paula J. Gomez, Greg Spring, Jonathan Larsen, and Paul James Tittensor.  Previously, the State of Utah together with all gross negligence claims were dismissed on August 8, 2008 and in October 2009 Defendants James Campos and Blaine Bills were dismissed. Officer Jean Loveland was also named in the original Complaint, but she was voluntarily dismissed shortly after the Complaint was filed.
[3] The remaining Defendants are Sherriff Lynn Yeates, Jail Commander Margaret Bull, Chief Deputy Kevin Potter, Sergeant Cathy Connell, Officer Phillip Zieseniss, Officer Bradley Nelson, Officer Anderw Ewell and Box Elder County.
[4] At oral argument the court also addressed Defendants' motion to strike certain exhibits filed by Plaintiffs (docket no. 110).  The court granted that motion in part.

# I. BACKGROUND[5]

On Friday November 9, 2007, Utah State Adult Probation and Parole (AP&P) Agents Jim Campos and Blaine Bills arrived at the home of the decedent's mother Susie Williams. Chad Peterson, who was a convicted felon, appeared to be under the influence of a controlled substance so the AP&P agents conducted a drug test. Mrs. Williams expressed her concerns to Campos and Bills about the mental health of Mr. Peterson based upon some things he was going through—the death of his stepfather and sister, and difficulties with bipolar disorder. Mrs. Williams told Campos and Bills about a suicide note that Mr. Peterson had left at his former treatment center. Concerned about this information, Campos asked Mrs. Williams whether she "had seen any suicidal actions or tendencies"[6] or if Mr. Peterson had acted in a manner or said anything to make her think he was suicidal. Mrs. Williams responded no.[7] Campos told Mrs. Williams and Mr. Peterson's brother, who was also present, they had done the right thing by calling them and that they would take Mr. Peterson to jail where he would be safe. Campos and Bills then transported Chad Peterson to the Box Elder County jail where a 72-hour hold was placed on Mr. Peterson pending a review by the Utah State Board of Pardons.

Upon arriving at the jail at approximately 9:30 p.m. Mr. Peterson was placed into a pre-booking cell and Agent Bills began filling out a pre-booking form. On the pre-booking form is a

---

[5] The court examines the factual record and draws all reasonable inferences therefrom in the light most favorable to Plaintiffs. *See Applied Genetics Int'l, Inc. v. First Affiliated Sec., Inc.*, 912 F.2d 1238, 1241 (10th Cir. 1990).
[6] Campos Deposition, p. 66:22-23.
[7] Plaintiffs contest Defendants assertion that Mrs. Williams responded no. Her specific response, however, is immaterial to the Court's decision because it is clear that neither Bills nor Campos spoke with the officers at the jail about the conversation they had with Mrs. Williams.

section titled "pre-medical screening."  In this section Bills noted that Mr. Peterson had no

indications of suicide, no indications of mental health problems and no obvious or visible

medical problems.[8]  Bills further indicated that no medications were brought with Mr. Peterson.

Neither Campos nor Bills told anyone at the jail about the conversation they had earlier that day

with Mr. Peterson's mother regarding the suicide note or her concerns about his mental health.

Before leaving, however, Campos did tell an officer that Mr. Peterson was under the influence of

an unknown controlled substance.

Officer Bradley Nelson began the initial booking process on the computer.  He noticed

that Mr. Peterson was sleeping in one of the pre-booking cells, so he used the information from

the pre-booking sheet completed by the AP&P agents.  Nelson noted Mr. Peterson was not

suicidal and did not have any mental health problems.[9]  After completing some initial booking

information Nelson began booking other inmates who were awake and waiting to be booked

because Mr. Peterson remained asleep in a pre-booking cell.  Nelson stayed later than his

assigned shift that evening because the Jail was experiencing water problems, but he did not have

any interaction with Mr. Peterson.

Officer Philip Zieseniss was the booking officer in charge of booking inmates into the

Jail from 10:00 p.m. to 6:00 a.m. on November 9-10.  Officer Zieseniss was not present when the

AP&P agents brought Mr. Peterson to the Jail and he had no contact with the agents after they

---

[8] *See* pre-booking form, attached as ex. D to the affidavit of Sherrif Lynn Yeates.
[9] *See* Nelson Affd. ¶ 5.

left.  Zieseniss was familiar with Mr. Peterson from prior incarcerations and because both Zieseniss and his wife knew Mr. Peterson's sister.[10]

Zieseniss saw Mr. Peterson sleeping during his night shift in one of the pre-booking cells. The cell had an all glass front and was used when an inmate was intoxicated or on drugs so they can be "easily and frequently observed to make sure there are no medical complications."[11]  At some point during his shift Zieseniss was told that Mr. Peterson had been high on heroin and that he was sleeping it off.

On November 10th at approximately 3:45 a.m. Zieseniss resumed the booking process after Mr. Peterson was awake and alert.  Zieseniss reviewed the information entered the night before from the pre-booking form and noted there was nothing indicating Mr. Peterson was suicidal.   Zieseniss "engaged in small talk with Chad because [they] knew each other."[12]  Mr. Peterson responded normally and he "did not appear to be depressed or have any problems"[13] so Zieseniss asked Mr. Peterson about his health and medical history.  The questions and responses to those questions are found on the Initial Inmate Assessment which was signed by both Officer Zieseniss and Mr. Peterson.  This form states:

Ask the inmate the following questions and record the answers:

1. Is this your first time in jail? [Answer] no
2. Are you NOW or have you RECENTLY received mental health counseling?
   [Answer] yes one week ago[ ] for depression[ ] at mckay dee hospital.

---

[10] *See* Zieseniss Affd. ¶ 3.
[11] *Id.* at ¶ 5.
[12] *Id.* at ¶ 8.
[13] *Id.*

3. Have you ever thought about committing suicide? [Answer] no
4. Are you thinking about it now? [Answer] no
5. Has anyone in your immediate family committed or attempted suicide? [Answer] no
6. What medications are you currently taking? [Answer] selexa, trazadone, seroquel, clonicin
7. Do you have any diseases now? [Answer] no
8. Are you in need of special medical care? [Answer] no
9. Do you have any enemies in this facility? [Answer] no[14]

Officer Zieseniss also filled out an Inmate Medical Assessment. This assessment states

in relevant part:

Answer each question based on your observation of the prisoner:

1. Is the prisoner disoriented, confused, or unconscious? [Answer] no
2. Does the prisoner complain of pain? [Answer] no
3. Does the prisoner have visible trauma or bleeding? no
4. Are there visible signs of alcohol or drug influence? [Answer] yes, heroin
5. Are there visible signs of withdrawal from alcohol or drugs? [Answer] coming down from heroin
6. Is there evidence of swelling, infection, or skin marks? [Answer] no
7. Is there evidence of vermin or jaundice? [Answer] no
8. Does the prisoner carry medications or report being on medications? [Answer] selexa, trazadone, seroquel, clonipin
9. Is behavior suggestive of assault risk for staff or other inmates? [Answer] no
10. Is the prisoner drug or alcohol intoxicated? [Answer] yes heroin
11. Is the prisoner's behavior violent or aggressive? [Answer]  no
12. Do the prisoner's wrists have any scars? [not answered]
. . .
15. Describe special measures you have taken for this prisoner: [Answer] none[15]

---

[14] Initial Inmate Assessment attached as ex. C to Affd. of Sheriff J. Lynn Yeates.
[15] Inmate Medical Assessment attached as ex. C to Affd. of Sheriff J. Lynn Yeates.

Sargent Cathy Connell was the supervisor in charge during the graveyard shift at the Jail from 10:00 p.m. to 6:00 a.m. on November 9-10, 2007. Her responsibilities included supervising the booking area. Sargent Connell saw Mr. Peterson sleeping in one of the pre-booking cells during her shift. Sargent Connell was familiar with Mr. Peterson from prior incarcerations and arrests and had seen him high on drugs previously when he had been brought to Jail on other occasions. Connell was present during the booking process and spoke with Mr. Peterson after he was brought from the pre-booking holding cell to the booking area. Connell did not observe any problems while Mr. Peterson was being questioned by Zieseniss during the booking process.

A review of the Jail policies provides that an inmate with suicidal ideations is placed in a suicide observation cell which is right in front of the booking counter. In similar fashion, if an inmate has apparent medical issues, he is placed in one of the medical cells where he can be observed.

Based on Mr. Peterson's answers to the questions and both Connell's and Zieseniss' observations, Mr. Peterson was taken to A-Pod at some point early on November 10th after Zieseniss completed the booking process. All inmates without medical issues or suicidal ideations are initially housed in A-Pod and assessed for future housing assignments.

Both Zieseniss and Connell left the Jail after their shift ended at 6:00 a.m. on November 10, 2007 and neither was present when Mr. Peterson committed suicide later that day.

Plaintiffs' state that Mr. Peterson refused his 6:00 a.m. does of antidepressants. In support Plaintiffs point to a note entered in Mr. Peterson's file by former Defendant Jean

Loveland and to a summary report used in an investigation of the incident.  Jail policy provides

that a nurse is to be notified when essential medications are not given.  The policy states that

"without these medications, significant medical consequences [such as] death . . . can occur."[16]

Whether Mr. Peterson actually refused his medication is not entirely clear from the

record.  The only evidence in the record is the note placed in Mr. Peterson's file by Jean

Loveland who is not a Box Elder County employee.  What is clear, however, is there is no

evidence that the officers on duty knew Mr. Peterson refused an "essential medication" as argued

by Plaintiffs.  For purposes of summary judgment the Court presumes that Mr. Peterson did not

take his 6:00 a.m. antidepressents and that the officers missed this fact.

Officers Bradley Nelson, Paul Tittensor, Greg Spring, Andrew Ewell and Johnathan

Larsen were on duty during the daytime on November 10, 2007.[17]  Upon arriving at the Jail for

the 2:00 p.m. shift, Nelson, Ewell and Tittensor participated in a pre-shift briefing.  They were

told the Jail was having a water or sewage problem that required officers to escort inmates

outside of the Jail into the recreation area to use portable toilets.  They were also informed that it

would be necessary to supply inmates with water in their cells.  During the briefing none of the

prior shift officers expressed any concerns regarding Mr. Peterson.

Jail policy provided that a head count should be done no less than three times during an

8-hour shift and that the officer performing the head count should verify that the inmate is

---

[16] Tittensor Dep. ex. 34 "Officer Medication Protocol and Procedure."

[17] As noted previously, Officers Larsen, Tittensor and Spring were dismissed by this Court because there was no substantial link between them and Mr. Peterson's death.

actually moving in his or her cell.[18]  Pursuant to this policy, Officer Tittensor conducted the 2:00

p.m. inmate head count for the A-Pod housing unit.  Officer Tittensor physically observed Mr.

Peterson in his cell and did not notice anything unusual.[19]

At approximately 3:00 p.m. Officers Tittensor and Nelson began a "walk-through" which

is required four times during an 8-hour shift.  A walk through generally takes more time than a

head count and involves an officer walking through and interacting with inmates to make sure

they are safe, healthy and not causing trouble.  During the walk through the officers discovered

that the inmate in the cell next to Mr. Peterson was causing water problems.  While dealing with

that inmate the officers noticed Mr. Peterson in his cell and did not see anything out of the

ordinary.[20]  After resolving the water issue, the officers left to deal with another issue involving

an inmate named Arbon who was being belligerent and uncooperative.  It was determined that

Arbon would need to be moved, but that it would have to be done later because it was 5:00 p.m.

and time for another inmate head count.[21]

Officers Nelson, Tittensor and Ewell were involved in the 5:00 p.m. inmate head count.

Officers Nelson and Tittensor perfomed the inmate count in the female and south section of the

Jail while Officer Ewell was responsible for the count on A-pod where Mr. Peterson was located.

Officer Ewell had recently completed his POST training and was undergoing on the job training

for new officers called FTO training.  During FTO training more experienced officers work

---

[18] *See* Tittensor Affd. ¶ 7; Ewell Affd. ¶ 6; and Nelson Affd. ¶ 10.
[19] *See* Tittensor Affd. ¶ 6.
[20] *See* Tittensor Affd. ¶¶ 9-10; Nelson Affd. ¶¶ 11-12.
[21] *See* Tittensor Affd. ¶ 12.

directly with and supervise new officers such as Officer Ewell. Ewell, who was going to assist in moving Arbon after the head count, admitted that he was "pretty anxious and nervous about being involved in my first incident with a belligerent inmate"[22] and was more focused on the upcoming encounter with Arbon, than on the 5:00 p.m. head count of A-pod. This nervousness led Ewell to "conduct a more cursory count than what [his] training indicated and what policy required."[23]

During a head count Jail policy required the officers to "see [the] actual skin of each inmate" and verify that "they were moving, awake, and actually in the cell."[24] Officer Ewell saw a blanket covering the lower bunk area in Mr. Peterson's cell and "assumed an inmate was sleeping behind the blanket and that no one was on the top bunk."[25] According to officers Nelson and Tittensor, the "count cleared" which means all inmates were accounted for. Officers Nelson, Tittensor and Ewell then went to move inmate Arbon to A-Pod. During the move Officer Nelson looked inside Mr. Peterson's cell and noticed that something appeared to be wrong. A request was sent for immediate help and Nelson and Ewell entered Mr. Peterson's cell to find that he had hung himself in a noose on the lower bunk. The officers engaged in lifesaving procedures and medical personnel were called. Paramedics transported Mr. Peterson to the local hospital where he was pronounced dead.

## II. DISCUSSION

---

[22] Ewell Affd. ¶ 9
[23] *Id.* at ¶ 10.
[24] *Id.* at ¶ 11.
[25] *Id.* at ¶ 12.

Defendants move for summary judgment against all of Plaintiffs' claims arguing that Plaintiffs cannot show the necessary prerequisites for liability against Box Elder County and its officials as required under 42 U.S.C. § 1983 and 1988. Defendants further assert that they are immune from suit under the Eleventh Amendment because the Sheriff and his subordinates are acting as mandated by state law in their official capacities in housing a state prisoner who is under the authority and jurisdiction of the State of Utah.

## A. Legal Standard

Federal Rule of Civil Procedure 56 permits the entry of summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."[26] The court must "examine the factual record and reasonable inferences therefrom in the light most favorable to the party opposing summary judgment."[27] "The mere existence of a scintilla of evidence in support of [a party's] position will be insufficient [to overcome a motion for summary judgment]; there must be evidence on which the jury could reasonably find for the [respective party]."[28]

The moving parties, which are the Defendants in this case, have "the initial burden of demonstrating the absence of any genuine issue of material fact to support the non-moving

---

[26] Fed.R.Civ.P. 56(c); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Alder v. Wal-Mart Sotres, Inc.*, 144 F.3d 664, 670 (10th Cir. 1998).
[27] *Applied Genetics Int'l, Inc. v. First Affiliated Sec., Inc.*, 912 F.2d 1238, 1241 (10th Cir. 1990).
[28] *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986); *see also Anderson v. Coors Brewing Co.*, 181 F.3d 1171, 1175 (10th Cir. 1999) ("A mere scintilla of evidence supporting the nonmoving party's theory does not create a genuine issue of material fact.").

party's case."[29]  Once the moving parties have met their burden, the burden then shifts back to

the nonmoving parties to show that there is a genuine issue of material fact.[30]  To discharge their

burden, the nonmoving parties must "go beyond the pleadings and by her own affidavits, or by

the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts

showing that there is a genuine issue for trial.'"[31]  If the non-moving parties fail to meet this

burden with respect to any essential element of their case on which they bear the burden of proof

at trial, then the moving parties are entitled to summary judgment because "a complete failure of

proof concerning an essential element of the nonmoving party's case necessarily renders all other

facts immaterial."[32]  Finally, the Court considers the "evidence in the light most favorable to the

non-moving party, drawing all reasonable inferences from the available underlying facts."[33]

## B.  Deliberate Indifference

Plaintiffs claim violations of the Fourth, Fifth, Eighth, Ninth, and Fourteenth

Amendments of the Constitution arguing that Defendants were deliberately indifferent.  During

oral argument Plaintiffs' counsel admitted that this case is properly brought under the Eighth

Amendment "or the Eighth Amendment as applied by the 14th Amendment."[34]  Mr. Peterson

was a convicted prisoner that was being housed based upon an alleged parole violation.  The

---

[29] *Jensen v. Kimble*, 1 F.3d 1073, 1076 (10th Cir. 1993) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)).

[30] *See Bacchus Industries, Inc. v. Arvin Industries, Inc.*, 939 F.2d 887, 891 (10th Cir. 1991).

[31] *Celotex*, 477 U.S. at 324 (quoting Fed. R. Civ. P. 56(e)).

[32] *Id.* at 323.

[33] *Jaramillo v. Colo. Judicial Dep't.*, 427 F.3d 1303, 1307 (10th Cir. 2005) (*en banc*) (*per curiam*) (quotation marks omitted).

[34] Tr. p. 36 (tr refers to the transcript of oral argument held before the Court on Defendants' motions).

Court, therefore, finds that his claims must be framed in the context of the Eighth Amendment and Plaintiffs' claims under the Fourth, Fifth, Ninth and Fourteenth Amendments are dismissed.

As set forth in the Complaint, all of the individually named Defendants in this action are sued in their official capacities, which is "simply another way of pleading an action against that entity."[35] Thus, the claims made against the individual Defendants are effectively claims against Box Elder County.[36] The Tenth Circuit has set forth the standard for municipal liability in *Hinton v. City of Elwood, Kan.*[37] The *Hinton* court states:

> A municipality may not be held liable under § 1983 solely because its employees inflicted injury on the plaintiff. Rather to establish municipal liability, a plaintiff must show 1) the existence of a municipal policy or custom, and 2) that there is a direct causal link between the policy or custom and the injury alleged. When the asserted policy consists of the failure to act, the plaintiff must demonstrate that the municipality's inaction was the result of ''deliberate indifference'' to the rights of its inhabitants.'[38]

Further, a municipality may not be held liable where there is no underlying constitutional violation by any of its employees.[39] The Tenth Circuit has stated that a "prison official's deliberate indifference to an inmate's serious medical needs violates the Eighth Amendment."[40] Therefore, the Court must first consider whether any of the named Defendants acted with deliberate indifference toward Mr. Peterson's medical needs.

---

[35] *Hinton v. City of Elwood, Kan.*, 997 F.2d 774, 783 (10th Cir. 1993).
[36] *See id.*
[37] *Id.*
[38] *Id.* at 782 (10th Cir. 1993) (internal citations omitted).
[39] *See id.*
[40] *Sealock v. Colorado*, 218 F.3d 1205, 1209 (10th Cir. 2000).

The law regarding deliberate indifference in the Tenth Circuit is summarized in *Sealock v. Colorado*.[41]  The Tenth Circuit states:

> A prison official's deliberate indifference to an inmate's serious medical needs violates the Eighth Amendment.  "Deliberate indifference" involves both an objective and a subjective component.  The objective component is met if the deprivation is "sufficiently serious."  A medical need is sufficiently serious "if it is one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention."  The subjective component is met if a prison official "knows of and disregards an excessive risk to inmate health or safety."[42]

Accordingly, Plaintiffs must demonstrate 1) that Mr. Peterson's depravation is sufficiently serious; and 2) that a prison official knows of and disregards an excessive risk to Mr. Peterson's health or safety.  If Plaintiffs cannot make these showings then Box Elder County cannot be held liable and Defendants are entitled to summary judgment.

Here, the Court finds that suicide is a sufficiently serious harm to satisfy the objective component of the deliberate indifference standard.

Next, the Court turns to the subjective component.  This component requires a mental state of at least recklessness as used in the criminal law context.  The Supreme Court stated "subjective recklessness as used in the criminal law is a familiar and workable standard that is consistent with the Cruel and Unusual Punishments Clause as interpreted in our cases, and we

---

[41] 218 F.3d 1205 (10th Cir. 2000).
[42] *Id.* at 1209 (internal citations omitted); *see also Farmer v. Brennan*, 511 U.S. 825, 847 (1994) (holding that "a prison official cannot be found liable under the Eighth Amendment for denying an inmate humane conditions of confinement unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.").

adopt it as the test for 'deliberate indifference' under the Eighth Amendment."[43]  Thus Eighth

Amendment liability requires "consciousness of a risk."[44]

Plaintiffs argue Defendants knew the following which show Mr. Peterson was a suicide

risk.  Defendants knew (1) Mr. Peterson had just been released from a mental health facility; (2)

that Mr. Peterson was high on heroin and heroin withdrawal is incredibly painful with a known

increased risk of suicide; (3) Mr. Peterson had a history of drug use; (4) Mr. Peterson had a

history of suicidal ideation and was recently categorized as a risk of suicide; (5) Mr. Peterson

had a recent family death and recent deaths in a family increase the risk of suicide; (6) Mr.

Peterson was on medicine to treat severe depression and severe depression increases the risk of

suicide and (7) Mr. Peterson refused his 6:00 a.m. dose of antidepressant.  In essence, Plaintiffs

argue that although the acts or omissions of one employee may not violate Plaintiff's rights,

combine those acts or omissions between several employees acting under a governmental policy

or custom and Plaintiff's rights are violated.

Plaintiffs position, however, is problematic in two regards.  First the record indicates that

none of the Defendants at the Jail possessed all the alleged information showing Mr. Peterson

was a risk of suicide.  And second, the record in this case does not support Plaintiffs' arguments.

For example, Plaintiffs allege that the Defendants knew Mr. Peterson was released from a

mental health facility one week before his arrest.  In support Plaintiffs cite to Zieseniss'

---

[43] *Farmer v. Brennan*, 511 U.S. at 839-40.
[44] *Id.* at 840.

deposition and to the Initial Inmate Assessment completed at the time of booking. These citations, however, do not support Plaintiffs' position. Instead, Zieseniss states that he knew Mr. Peterson "received counseling" at a mental health facility, not that he knew Mr. Peterson was in a mental health facility or recently released from being a patient at a facility. The Initial Inmate Assessment provides that Mr. Peterson had received mental health counseling one week ago at McKay Dee hospital but it does not state that he was in an inpatient facility as Plaintiffs allege.

Perhaps former Defendants Bills and Campos knew this from their conversation with Mr. Peterson's mother. But, the record is clear that neither Bills nor Campos told any of the Jail officers about Mrs. Williams' concerns. Bills and Campos did not indicate anything on the pre-booking form that would have given notice of suicide ideations to the booking officers Nelson and Zieseniss. Further, even if the officers knew that Mr. Peterson had been recently released from a mental health facility the week before, that alone would not be enough to meet the deliberate indifference standard.[45]

In similar fashion, contrary to Plaintiffs' position, the officers did not know Mr. Peterson had a history of suicidal ideation and was recently categorized as a risk of suicide. In support of this assertion Plaintiffs cite to exhibits that were completed by former Defendant Bills. Yet, as the record shows, Bills did not share this information with any of the Jail officers and Bills was not an employee of Box Elder County.

---

[45] *See Hocker v. Walsh*, 22 F.3d 995, 1000 (10th Cir. 1994).

In short, Plaintiffs attempt to demonstrate the "consciousness of risk"[46] required under deliberate indifference by imputing the knowledge of Defendants, and former Defendants such as Bills and Campos, to other Defendants. This so called "Super-Defendant" that has the requisite knowledge of Mr. Peterson's risk of suicide simply does not exist in the record. The Court acknowledges that the outcome of this case may have been different if the officers had been placed on notice by Bills and Campos. Based on the facts before the Court, however, the Court concludes summary judgment is appropriate for Defendants.

Next, the record does not support Plaintiffs' arguments. For example, none of the officers knew that heroin withdrawal may increase the risk of suicide. And, contrary to Plaintiffs' assertions, the way the officers treated Mr. Peterson during his heroin withdrawal appears consistent with ensuring Mr. Peterson's safety. The officers placed Mr. Peterson in a cell that was easily and frequently observed while he was recovering from the effects of heroin. During the booking both Zieseniss and his supervisor Connell interacted and observed Mr. Peterson to determine if he was acting normal. These officers had seen Mr. Peterson high on drugs before from prior incarcerations and presumably had seen him when he was acting normal. Zieseniss testified that based on his training he would not have completed the booking process if Mr. Peterson appeared to be still under the influence of heroin or if he had responded inappropriately to questions.[47] Based on the record there is no reason for this Court to assume

---

[46] *Farmer v. Brennan*, 511 U.S. at 840.
[47] *See* Zieseniss Aff. ¶ 9.

that Officers Zieseniss or Connell somehow missed indications that Mr. Peterson was still high on heroin during his booking. The fact that some of these officers knew Mr. Peterson was under the influence of heroin at one time, does not, by itself give the officers knowledge that Mr. Peterson possessed a risk of suicide.[48]

Finally, Mr. Peterson's own answers to the Assessment questions would have provided Zieseniss and Connell with further certainty that it was appropriate to place Mr. Peterson in Pod-A and not in a suicide observation cell. Plaintiffs take issue with the fact that the booking officers failed to ask follow-up questions to the answers Mr. Peterson gave during the booking process. The Court has reviewed the questions posed by the booking officers and Mr. Peterson's answers. While no policy or custom is 100% certain and fool proof, the Court finds the questions asked were sufficient under the deliberate indifference standard. Plaintiffs advocate for additional follow-up questions without defining when such questioning would ever come to an end. Given Mr. Peterson's answers and demeanor, there was no clear need in this case to follow-up with further questions. One cannot, in the Court's view, expect booking officers to continue to ask additional questions about suicide when those officers do not have sufficient information before them indicating that an individual is a suicide risk.

The Court, however, is concerned with the serious mistakes made by Officer Ewell during his 5:00 p.m. count of A-Pod. Ewell admits that he failed to follow Jail policy and procedure in making these mistakes. Courts have concluded that "neither prison officials nor

---

[48] *See Hocker v. Walsh*, 22 F.3d 995, 1000 (10th Cir. 1994).

municipalities can absolutely guarantee the safety of their prisoners." [49]  But, they are responsible for taking reasonable measures to insure the safety of inmates and a failure to do so may violate the Eighth Amendment if the prison official shows deliberate indifference to an inmate's serious medical needs. [50]  Here, the evidence shows that Ewell lacked the requisite knowledge that Mr. Peterson was a suicide risk.  Ewell's failure to follow the Jail policies and procedures, which could have potentially saved Mr. Peterson's life, "while no cause for commendation, cannot . . . be condemned as the infliction of punishment."[51]

In sum, no facts suggest that the officers had knowledge of the specific risk that Mr. Peterson would commit suicide.  "Nor do the facts [*in toto*] suggest that [Mr. Peterson's] risk of suicide was so substantial or pervasive that knowledge can be inferred."[52]  Summary judgment therefore is appropriate for Defendants and Plaintiffs have failed to show an underlying constitutional violation by any of the officers.

## C.  Plaintiffs Fail to Establish a Claim Under § 1983 Against Box Elder County

Even if this Court concluded that Plaintiff had established an underlying employee constitutional violation, Plaintiffs have failed to sufficiently allege a § 1983 claim against Sheriff Lynn Yeates, and Box Elder County.  Plaintiffs bring this suit against the individual Defendants in their official capacity which is another way of pleading an action against an entity—in this

---

[49] *Lopez v. LeMaster*, 172 F.3d 756, 759 (10th Cir. 1999) (internal citation omitted).
[50] *See id.*
[51] *Farmer*, 511 U.S. at 838.
[52] *Hocker v. Walsh*, 22 F.3d 995, 1000 (10th Cir. 1994).

case Box Elder County. [53]  So, any failure to properly assert a claim against Box Elder County also applies to all the individual Defendants.

To establish a claim for damages under § 1983 against a municipal entity the plaintiff must prove that (1) the entity executed a policy or custom  (2) that caused the plaintiff to suffer deprivation of constitutional or other federal rights.[54]  Or, in other words, there must be a "direct causal link between the policy or custom and the injury."[55]   "'[A] municipality cannot be held liable under § 1983 on a respondeat superior theory.'"[56]

The Tenth Circuit has recognized that a municipality may be held liable under § 1983 if the final policymaker takes the unconstitutional action.[57]  Usually "proof of a single incident of unconstitutional activity is ordinarily not sufficient to impose municipal liability."[58]  Unless the plaintiff can show that the "particular illegal course of action was taken pursuant to a decision made by a person with authority to make policy decisions on behalf of the entity being sued."[59]

Here, Sheriff Lynn Yeates is the final policymaker for purposes of Jail policy and administration.[60]  Chief Potter and Jail Commander Bull are not final policymakers and were not present when Mr. Peterson committed suicide.  As set forth in the Complaint, Plaintiffs rely on

---

[53] *See Moss v. Kopp*, 559 F.3d 1155, 1169 (10th Cir. 2009); *Hinton*, 997 F.3d at 783.

[54] *See id.*

[55] *Hinton*, 997 F.2d at 783.

[56] *Leatherman v. Tarrant County Narcotics Intelligence & Coord. Unit*, 507 U.S. 163, 166 (1993) (quoting *Monell v. Dep't of Social Srvs. of City of N.Y.*, 436 U.S. 658, 691 (1978).

[57] *See Melton v. City of Oklahoma City*, 879 F.2d 706, 724 (10th Cir. 1989) (rev'd en banc in part on other grounds, 928 F.2d 920 (10th Cir. 1991)).

[58] *Moss*, 559 at 1169.

[59] *Id*.

[60] *See Milligan-Hitt v. Brd. of Trustees of Sheridan County*, 523 F.3d 1219, 1224 (10th Cir. 2008) (holding that the determination of who is the final policymaker is a question of law left for the court to decide).

the conduct of the officers who were involved with Mr. Peterson's incarceration in trying to establish liability. As such, Plaintiffs appear to be alleging respondeat superior liability for Sheriff Lynn Yeates and Box Elder County, which the Supreme Court has ruled cannot support § 1983 liability against municipalities.[61]

In addition Plaintiffs have failed to demonstrate that "'the need for more or different training [was] so obvious, and the inadequacy so likely to result in the violation of [Mr. Peterson's due process] rights, that the policymakers of [Box Elder County] can reasonably be said to have been deliberately indifferent to the need for additional training.'"[62] It is not enough to "show that there were general deficiencies in the county's training program for jailers."[63] "Rather, a plaintiff must 'identify a specific deficiency' that was obvious and 'closely related' to his injury, so that it might fairly be said that the official policy or custom was both deliberately indifferent to his constitutional rights and the moving force behind his injury."[64]

Here, Plaintiffs allege general deficiencies in policies or that the county should have more policies in place, such as a policy to treat individuals who have taken heroin in a different manner than other individuals who may have used other drugs. Such general allegations without specifying more is not enough to establish liability against Sheriff Yeates or Box Elder County. In sum Plaintiffs have failed to show a direct causal link between alleged defects in any policy

---

[61] *See Leatherman*, 507 U.S. at 166 (observing that a municipality cannot be held liable under § 1983 on a respondeat superior theory).
[62] *Porro v. Barnes*, 624 F.3d 1322, 1328 (10th Cir. 2010) (first alteration in original) (quoting *Jenkins v. Wood*, 81 F.3d 988, 994 (10th Cir. 1996)).
[63] *Lopez v. LeMaster*, 172 F.3d 756, 760 (10th Cir. 1999).
[64] *Porro* 624 F.3d at 1322 (internal citations omitted).

and training and Mr. Peterson's suicide.[65]  Therefore summary judgment is appropriate for

Defendants.[66]

## III. CONCLUSION

As outlined above, the Court concludes Plaintiffs have failed to meet their burden with

respect to essential elements of their case.  "[A] complete failure of proof concerning an essential

element of the nonmoving party's case necessarily renders all other facts immaterial."[67]

It is therefore

ORDERED that Defendants' Motion for Summary Judgment[68] is GRANTED.  The Clerk

of the Court is directed to close this case.

DATED this 21st day of June, 2011.

Brooke C. Wells
United States Magistrate Judge

---

[65] *See Board of County Commis. v. Brown*, 520 U.S. 397, 404 (1997) (stating that a "plaintiff must show that the municipal action was taken with the requisite degree of culpability and must demonstrate a direct causal link between the municipal action and the deprivation of federal rights").
[66] The Court finds it does not need to address Defendants remaining argument regarding immunity under the Eleventh Amendment.
[67] *Celotex*, 477 U.S. at 323.
[68] Docket no. 86.